NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**HEATHER ROGERO, WALTER A. ROGERO, II, W.R., A MINOR,**
*Petitioners-Appellants*

**v.**

**SECRETARY OF HEALTH AND HUMAN SERVICES,**
*Respondent-Appellee*

---

2018-1684

---

Appeal from the United States Court of Federal Claims in No. 1:11-vv-00770-EDK, Judge Elaine Kaplan.

---

Decided: September 12, 2018

---

HEATHER ROGERO, WALTER A. ROGERO, II, W.R., Mountain Home, AR, pro se.

VORIS EDWARD JOHNSON, JR., Vaccine/Torts Branch, Civil Division, United States Department of Justice, Washington, DC, for respondent-appellee. Also represented by C. SALVATORE D'ALESSIO, CATHARINE E. REEVES, CHAD A. READLER.

---

Before DYK, LINN, and TARANTO, *Circuit Judges.*

PER CURIAM.

Heather Rogero and Walter Rogero, II, the parents of W.R., a minor, filed a petition for compensation under the National Childhood Vaccine Injury Act of 1986, codified as amended at 42 U.S.C. §§ 300aa-1 to -34. They alleged that W.R. suffered injuries, including encephalopathy, caused at least in part by vaccinations that he received before his second birthday. The special master denied compensation, and the United States Court of Federal Claims affirmed. Because the Court of Federal Claims correctly concluded that the special master's decision was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, we affirm.

## I

## A

Born in September 2008, W.R. received vaccinations on six occasions before his second birthday. *Special Master Decision* at 15–21.[1] *First*: On November 19, 2008, when he was roughly two months old, W.R. received Pediarix, which includes "the diphtheria/tetanus/pertussis (DTaP), hepatitis B, and inactivated polio vaccines), Hib (Haemophilus influenza type B), and pneumococcal vaccination." *Id.* at 15. *Second*: He received Pediarix and pneumococcal vaccinations at his four-month well-visit on January 19, 2009. *Id.* at 15–16. *Third*: He again received Pediarix and pneumococcal vaccinations on April 27, 2009. *Id.* at 17. *Fourth*: At about eleven months of age,

---

[1]    The special master's decision appears at *Rogero v. HHS*, No. 11-770V, 2017 WL 4277580 (Fed. Cl. Sept. 1, 2017). In citing the opinion, we use the pagination as it was released, not Westlaw pagination.

on August 1, 2009, W.R. received a Hib vaccination. *Id.* at 18. *Fifth*: On September 24, 2009, he received additional vaccinations, which the medical records suggest were a Hepatitis A vaccine and either a Hib or a varicella vaccine. *Id.* at 18–19. *Sixth*: More than seven months later, on May 4, 2010, W.R. received a DTaP vaccine. *Id.* at 20.

Thus, five of the six vaccinations occurred before the end of 2009. Until the end of 2009, when the family moved, W.R.'s main doctor was Christopher Dalton, D.O., though W.R. saw other medical service providers. The sixth vaccination—when he was given his fourth DTaP vaccine, which the Rogeros have emphasized in this court—occurred in May 2010. By then he was seeing other providers.

According to the medical records of 2008 and 2009, on the same day as his first vaccinations, W.R. missed the developmental milestone of "turns head to sound." *Id.* at 15. At four months of age, he missed the "rolling" milestone, and his medical records do not report rolling until he was about eight months old. *Id.* at 15–17. At five months old, on February 13, 2009, he was diagnosed as underweight and failing to thrive. On March 11, 2009, he was referred to SoonerStart, an early intervention developmental therapy program. *Id.* at 16. At his nine-month checkup, on June 16, 2009, W.R. was recorded as missing most of his developmental milestones. He "was assessed as being underweight, having short stature, and as being 'off on his development and delayed.'" *Id.* at 17. Although he made some improvement and had several appointments with SoonerStart throughout the summer, he again missed most of his developmental milestones at his one-year checkup on September 24, 2009. *Id.* at 17–18.

The medical records from before 2010 also report other medical issues. W.R. was assessed as having "bad cradle cap" (November 19, 2008), episodes of congestion (November 19, 2008; January 3, 2009), discharge from his

eyes (December 3, 2008), and infantile eczema (December 3, 2008; February 13, 2009; and April 27, 2009). *Id.* at 15–19. By the time he was four months old, W.R. had started "having problems of spitting up after eating and while lying down for a diaper change." *Id.* at 15. He had multiple ear infections in 2009, one in early March and a second in mid-April; he went to the hospital on March 2, 2009 for bronchiolitis; he had allergic reactions, including an episode of hives that resulted in an urgent care visit on April 25, 2009; and he was regularly deemed under-weight. *Id.* at 16–18.

On December 18, 2009, Dr. Dalton assessed W.R. as "essentially behind with fine motor skills and language development," and he recommended aggressive speech and physical therapy. *Id.* at 19. After W.R.'s family moved, W.R. received his sixth vaccination—on May 4, 2010, at his appointment with Barbara Stevens, M.D. W.R. had a follow-up appointment with Dr. Stevens three days later, and the record of that visit contains no report of regression or any negative symptoms. *Id.* at 20.

On June 8 and 15, 2010, W.R. was evaluated by a developmental pediatrician. The notes from the evaluation state that W.R. "meets the DSM [Diagnostic and Statistical Manual] criteria for Autism," but that the pediatrician was deferring adoption of the diagnostic label until W.R.'s second birthday, "even though the literature indicates that the presence of these significant findings is likely to be consistent." *Id.* at 21–22.

In late June 2010, W.R. saw Dr. Stevens for rhinorrhea and constipation. The Special Master summarized the records from Dr. Stevens: "Among other things, those records from Dr. Stevens reflect a description of W.R. as a 21-month-old boy with failure-to-thrive and autism." *Id.* at 20.

Shortly thereafter, W.R.'s parents changed his primary care provider. While meeting in July 2010 with a

pediatrician at the new provider, Mrs. Rogero asked about "mercury poisoning" and speculated about potential causes of W.R.'s autism. *Id.* at 20 n.33. In late July 2010, W.R. went to the emergency room and was assessed as having an allergic reaction. In September 2010, W.R. visited the emergency room and was assessed as having an acute upper respiratory infection. *Id.* at 21.

Between June and September 2010, W.R. saw a number of specialists. In addition to the developmental pediatrician (noted above), W.R. also saw an allergist, several neurologists, a cardiologist, and a gastroenterologist. In particular, W.R. saw neurologist Lucy Civitello, M.D., in late September. The records report an "admitting diagnosis" of "[e]ncephalopathy NOS [not otherwise specified]" and Mrs. Rogero's statements about W.R.'s diagnoses of autism and eczema as well as her assertion that he was possibly injured by aluminum-based vaccines. *Id.* at 21–23.

On October 25, 2010, W.R. underwent a 23-hour EEG study. No seizure activity was seen on the test, and W.R.'s results were "within normal limits." *Id.* at 23. W.R.'s subsequent medical records indicate that he has "continued to suffer from an autism spectrum disorder, developmental delays, and other medical conditions." *Id.* at 24.

B

Acting *pro se*, Heather and Walter Rogero (the Rogeros) filed a petition for compensation on W.R.'s behalf on November 15, 2011. They ultimately retained counsel, and the case was assigned to a special master under 42 U.S.C. §§ 300aa-12(c)(1), 300aa-12(d)(3)(A). The special master received medical records, medical and other literature, and the testimony of numerous experts on both sides. The Rogeros sought to prove that the aluminum in vaccines received by W.R. can cause "neurodevelopmental

disorders, such as encephalopathy or autistic symptoms," *Special Master Decision* at 68, and did so in W.R.'s case.

On September 1, 2017, the special master filed his decision. He rejected the Rogeros' evidence as unpersuasive for various reasons. He denied compensation, finding that the Rogeros had not proved causation under the applicable standards of 42 U.S.C. §§ 300aa-11(c)(1)(C), 300aa-14 and 42 C.F.R. § 100.3, as interpreted by this court in cases such as *Althen v. HHS*, 418 F.3d 1274, 1278 (Fed. Cir. 2005), *Pafford v. HHS*, 451 F.3d 1352, 1355–56 (Fed. Cir. 2006), and *Moberly v. HHS*, 592 F.3d 1315, 1322 (Fed. Cir. 2010). *See also LaLonde v. HHS*, 746 F.3d 1334, 1341 (Fed. Cir. 2014). He noted the variety of causation theories presented by the Rogeros' evidence and concluded: "After thoroughly reviewing the record of this case, I have found *all* of the causation theories advanced in this case to be quite *unpersuasive*." *Special Master Decision* at 47; *see id.* at 82–83.

In so finding, the special master explained that the Rogeros' experts based their causation opinions in key respects on "facts alleged by W.R.'s parents" that "d[id] not appear in W.R.'s contemporaneous medical records." *Id.* at 48 (emphasis omitted). He found that the contemporaneous records were "more reliable" than the parental testimony, which he found to be unreliable. *Id.* Because the expert testimony was based on assertions of fact that did not appear in the medical records, the special master determined that the Rogeros' experts had relied on "critical misassumptions of fact" in forming their opinions, rendering the opinions "fatally flawed" and "wholly unreliable." *Id.* (emphasis omitted); *see id.* at 49–57.

The special master also found that the qualifications of the government's experts were "*overwhelmingly superior*" to those of the Rogeros' experts and, in addition, were "*far more persuasive*" in the content of their testimony than were the Rogeros' experts. *Id.* at 48; *see id.* at 57–68.

In particular, he found that the Rogeros' experts "failed to demonstrate the *basic premise* of their causation arguments, that the tiny amount of *aluminum* in vaccination *can* cause any harm to vaccinees" or "that the aluminum in *W.R.'s own* vaccines caused him to suffer an 'encephalopathy,' caused his autism spectrum disorder, or caused any other harm." *Id.* at 48; *see id.* at 68–70. Nor did the Rogeros' experts prove the allegations that W.R. had an immune system disorder or a mitochondrial disorder or was more susceptible to harm by vaccinations because of his genetic variants. *Id.* at 48–49; *see id.* at 70–76.

For these and other reasons, the special master determined that the Rogeros had demonstrated neither that vaccines could cause injuries of the type W.R. suffered nor that W.R.'s vaccinations had caused his specific injuries. Therefore, he determined that the Rogeros were not entitled to Vaccine Act compensation. *Id.* at 85.

On October 2, 2017, the Rogeros timely sought review of the special master's decision in the Court of Federal Claims pursuant to 42 U.S.C. § 300aa-12(e). That court sustained the special master's decision on January 11, 2018, J.A. 323–33, and the judgment was entered the next day, J.A. 740.

On March 8, 2018, within the 60 days permitted by 42 U.S.C. § 300aa–12(f), the Rogeros appealed to this court. They are now acting pro se. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

II

Our task on appeal is to review the special master's decision under the same standard of review that is applied by the Court of Federal Claims. *Milik v. HHS*, 822 F.3d 1367, 1375 (Fed. Cir. 2016). As relevant here, we must uphold the special master's factual findings unless they are arbitrary and capricious. *Id.* at 1376. We have described such review in the Vaccine Act context as

"uniquely deferential." *Id.* If a special master's finding is "based on evidence in the record that [is] not wholly implausible, we are compelled to uphold that finding as not being arbitrary or capricious." *Id.*

Like all or nearly all Vaccine Act cases, this case involves an individual with undisputed, serious, burdensome, indeed life-altering medical problems. But the Vaccine Act does not provide for compensation of all such conditions. To support compensation under the Vaccine Act in this case, the Rogeros had to establish causation in fact of the asserted injury—specifically, W.R.'s neurological difficulties. Specifically, they had to show, by a preponderance of the evidence, (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a proximate temporal relationship between vaccination and injury. *Althen*, 418 F.3d at 1278. This is not a case subject to the special, less burdensome standards for establishing causation applicable to certain injuries listed on an official "table" where symptoms appear in a specified time. *See* 42 U.S.C. § 300aa–14; 42 C.F.R. § 100.3. Although one of the injuries claimed, an "encephalopathy," can be a table injury, *see* 42 C.F.R. § 100.3, there was no allegation and proof in this case that W.R.'s symptoms appeared in the statutorily required time, and so the case was presented and tried under the usual standards requiring proof of causation.

The special master found that the Rogeros' proof failed under all three of the *Althen* requirements. He found that the proof (1) did not establish that "aluminum adjuvants in vaccines can cause neurological injury," (2) did not establish "that it is 'more probable than not' that W.R.'s vaccinations containing aluminum adjuvants did contribute to the causation of one or more of W.R's own neurologic or autoimmune conditions," and (3) also did not establish "a proximate temporal relationship between the

vaccination and the injury." *Special Master Decision* at 84 (emphasis omitted). On appeal, we conclude, the Rogeros have not shown that these findings, which followed the established legal standards, were arbitrary and capricious.

The Rogeros' contentions, at bottom, take issue with the special master's interrelated findings that deemed the medical records as to W.R.'s conditions more reliable than the Rogeros' testimony, that credited the government's experts over the Rogeros' experts, and that accepted the autism diagnosis over some other "encephalopathy" diagnosis. In all of those respects, however, we see no basis for rejecting the special master's findings as arbitrary and capricious.

The special master determined that it was appropriate to "credit the contemporaneous medical records over the assertions" of the Rogeros, whose testimony about conditions he did not find reliable. *Special Master Decision* at 49 (emphasis omitted). Determinations of relative weight of different evidence are generally for the trier of fact. *See Moberly*, 592 F.3d at 1325–26. More particularly, it is a familiar and reasonable assessment that contemporaneous documentary evidence of the sort at issue here, prepared by professionals doing their jobs independently of litigation, can be (though is not necessarily) more reliable than testimony of interested parties. *See Cucuras v. HHS*, 993 F.2d 1525, 1528 (Fed. Cir. 1993); *Reusser v. HHS*, 28 Fed. Cl. 516, 523 (1993) (stating that "written documentation recorded by a disinterested person at or soon after the event at issue is generally more reliable than the recollection of a party to a lawsuit many years later"); *cf. Randall Mfg. v. Rea*, 733 F.3d 1355, 1362–63 (Fed. Cir. 2013) (documentary evidence may be more reliable in patent context); *Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1350–51 (Fed. Cir. 2001) (documents preferred to corroborate

inventor testimony). We see nothing unreasonable about applying that rationale in this particular case.

The special master likewise had a sufficient basis for finding the testimony of the government's experts more persuasive than that of the Rogeros' experts. That finding rested in part on detailed comparisons of the experts' qualifications. *Special Master Decision* at 57–63. It rested in part on detailed explanations of problems with the content of the testimony of the Rogeros' experts, including problems of inconsistency and inadequate support in medical literature. *Id.* at 63–68.

Perhaps most importantly, the special master's findings rested on the strength of the explanations given by the government's experts, especially as to the deficiencies of key bases for the assertions of the Rogeros' experts. For example, the special master reasonably credited government expert Dr. Edward Cetaruk's explanation that the Rogeros' experts had no sound scientific foundation for finding injury causation from "the tiny amount of aluminum" in the vaccines at issue. *Id.* at 69. Similarly, the special master reasonably credited government expert Dr. Max Wiznitzer's explanation that the contemporaneous medical records "show that W.R.'s development *gradually* got further and further behind the typical child's development course, *without* a series of *distinct regressions* after each vaccine administration, as some of [the Rogeros'] experts assumed." *Id.* at 56; *see id.* at 50–56. Likewise, the special master reasonably credited government expert Dr. Andrew MacGinnitie's explanation of why W.R.'s medical records contradicted the assertion that W.R. had abnormal immune reactions to the vaccinations. *Id.* at 70. With respect to the Rogeros' assertions about genetic variants and mitochondrial dysfunction, the special master examined in detail the weaknesses in the testimony by the Rogeros' experts as shown by the testimony of the government's experts. *Id.* at 72–76. The Rogeros have not shown that this analysis—including its

repeated demonstration of how the Rogeros' experts relied on factual assumptions not supported by the contemporaneous medical records—was arbitrary and capricious.

The Rogeros also criticize the special master's decision for its crediting of the diagnosis of autism, arguing that it should have focused on "encephalopathy."  But as an initial matter, there was a sufficient basis in the record for the special master to accept the autism diagnosis.  The medical records, which we have summarized above, support the finding that "W.R.'s medical records show that he has been definitively diagnosed with an autism spectrum disorder."  *Id.* at 80.[2]  And the government's expert, Dr. Wiznitzer, confirmed the propriety of the diagnosis based on the records and explained the reasons in adequate detail.  *See id.* at 45–46, 56, 81 n.68 (recounting testimony).

And in any event, the special master did not limit his focus.  He concluded that the Rogeros had "failed to show that the aluminum in vaccines harmed W.R. *in any way*" and that "the outcome of this case would be no different if W.R. had never been diagnosed with an ASD."  *Id.* at 80–81 (emphasis added).  The Rogeros have not shown lack of support for that finding.  And that finding makes immaterial their contention that W.R. met diagnostic criteria for "encephalopathy" as defined in the Table and the DSM-IV—neither of which, moreover, was a basis for any cited testimony by the Rogeros' experts.

---

[2]   It has not been shown that the issues before us are materially affected by any difference between "autism" and (a newer nomenclature) "autistic spectrum disorder," both terms having been used throughout this case.

## III

The Rogeros have not shown reversible error—in particular, they have not shown arbitrary and capricious fact finding—in the special master's determination that they failed to show by a preponderance of the evidence that W.R.'s vaccinations caused any of his alleged injuries. Accordingly, we affirm the Court of Federal Claims' decision.

No costs.

**AFFIRMED**