NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

_____

**MARK MILES, LEGAL REPRESENTATIVE OF A MINOR CHILD J.M.,**
*Petitioner-Appellant*

**v.**

**SECRETARY OF HEALTH AND HUMAN SERVICES,**
*Respondent-Appellee*

_____

2019-1480

_____

Appeal from the United States Court of Federal Claims in No. 1:12-vv-00254-LAS, Senior Judge Loren A. Smith.

_____

Decided: May 8, 2019

_____

MARK MILES, Carrollton, TX, pro se.

DARRYL R. WISHARD, Vaccine/Torts Branch, Civil Division, United States Department of Justice, Washington, DC, for respondent-appellee. Also represented by JOSEPH H. HUNT, C. SALVATORE D'ALESSIO, HEATHER LYNN PEARLMAN, CATHARINE E. REEVES.

_____

Before DYK, MOORE, and TARANTO, *Circuit Judges*.

PER CURIAM.

Pro se petitioner, Mark Miles, the parent of J.M., filed a petition for compensation under the National Childhood Vaccine Injury Act of 1986 ("Vaccine Act"), codified as amended at 42 U.S.C. §§ 300aa-1 to -34. A special master denied the petition on the merits, and the Claims Court denied review. Because we find that the Claims Court correctly concluded that the special master's decision was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, we *affirm*.

## BACKGROUND

This case involves an aggravation claim. Petitioner claims that his son, J.M., suffered a relapse of his preexisting nephrotic syndrome because of an October 1, 2009, influenza vaccine.

J.M. was born on February 23, 2001. Throughout J.M.'s early childhood, he received numerous vaccines without suffering any side effects. On September 6, 2007, J.M. was taken to a children's hospital after experiencing body swelling (i.e., edema) and a renal ultrasound was performed, which showed findings "consistent with the typical findings seen in nephrotic syndrome, including large kidneys with increased echogenicity." J.A. 4.[1] On October 11, 2007, J.M.'s doctor noted that "J.M. had new-onset nephrotic syndrome [a large group of diseases involving defective renal glomeruli and characterized by excess protein and lipids in the urine, with varying degrees of body swelling, and abnormally low levels of serum albumin and a decrease in plasma lipoprotein], and a moderate amount of proteinuria [an excess of protein in the urine]." J.A. 4. J.M.

---

[1] Uses of "J.A." throughout this opinion refer to the appendix included with the respondent's brief.

was then started on prednisone, a steroid, to treat his nephrotic syndrome. Eventually, J.M. was weaned from the steroid.

Over the years that followed, J.M. experienced medical issues, including bronchitis and persistent hypertension, and received several vaccines, including a November 19, 2008, influenza vaccination. J.M. did not experience a relapse of nephrotic syndrome in response to any of these events. Sometime in June 2009, J.M. experienced a relapse of his nephrotic syndrome and was again placed on steroids.[2] There was no report of any illness that could have triggered the relapse.

On October 1, 2009, J.M. received the influenza vaccine at issue here. On October 9, 2009, J.M. again visited his treating doctor who noted that J.M. had generally done well since August 2009, but had suffered an increase in urine protein and edema over the past two weeks. J.M.'s urine protein apparently increased immediately following the influenza vaccination and was "markedly higher the morning after his flu vaccination." J.A. 6. J.M. was again placed on steroids.

As J.M. was being weaned from steroids between November and December of 2009, he suffered a third relapse of nephrotic syndrome. J.M. suffered several relapses thereafter, and in mid-2011, J.M.'s nephrotic syndrome stopped responding to steroid treatment. Later in 2011, J.M. suffered a cardiovascular attack, three strokes, and a syncopal episode.

On April 18, 2012, petitioner filed a petition claiming that an influenza vaccine administered to his son, J.M., on

---

[2] J.M.'s treating physician noted on August 26, 2009, that J.M. had also suffered a relapse of nephrotic syndrome in February of 2008 (cause unknown), but there is no other indication in J.M.'s medical records that this was the case.

October 1, 2009, caused J.M. to have a "relapse of his preexisting nephrotic syndrome."[3]  A special master held a hearing on October 17 and 18, 2017, where she heard expert testimony on both sides.

On June 28, 2018, the special master issued an opinion denying compensation and dismissing the petition on the merits.  Petitioner filed a motion for review of the special master's decision, which the Claims Court denied on December 20, 2018.  Petitioner now appeals, and we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

## DISCUSSION

"We review an appeal from the [Claims Court] in a Vaccine Act case de novo, applying the same standard of review that court applied in reviewing the special master's decision." *Milik v. Sec'y of Health & Human Servs.*, 822 F.3d 1367, 1375 (Fed. Cir. 2016).  We set aside the special master's fact findings only if they are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  42 U.S.C. § 300aa-12(e)(2)(B); *Milik*, 822 F.3d at 1376.

The arbitrary and capricious standard is particularly difficult to satisfy where, as here, the appellant challenges a special master's weighing of the evidence.  See *Milik*, 822 F.3d at 1376.  It is not within the purview of this court to reweigh the evidence or to assess whether the special master correctly evaluated such evidence.  *Id.*

To prevail on an aggravation claim in a vaccine case, "[a] petitioner must prove by preponderant evidence that the vaccination caused significant aggravation by showing":

---

[3]    The petitioner also filed an amended petition and supplemental petition on August 6, 2012, and October 23, 2012, respectively.

> (1) the person's condition prior to administration of the vaccine, (2) the person's current condition (or the condition following the vaccination if that is also pertinent), (3) whether the person's current condition constitutes a "significant aggravation" of the person's condition prior to vaccination, (4) a medical theory causally connecting such a significantly worsened condition to the vaccination, (5) a logical sequence of cause and effect showing that the vaccination was the reason for the significant aggravation, and (6) . . . a proximate temporal relationship between the vaccination and the significant aggravation.

*W.C. v. Sec'y of Health & Human Servs.*, 704 F.3d 1352, 1357 (Fed. Cir. 2013) (alteration in original) (quoting *Loving v. Sec'y of Health & Human Servs.*, 86 Fed. Cl. 135, 144 (2009)). We must sustain the special master's decision if supported by substantial evidence. *See Doe v. Sec'y of Health & Human Servs.*, 601 F.3d 1349, 1355 (Fed. Cir. 2010).

There is no argument on appeal that that the special master committed legal error. Petitioner argues only that the special master's decision is unsupported by substantial evidence.

Here, the special master reviewed J.M.'s medical history and testimony from both petitioner's experts (Dr. Quan, J.M.'s treating physician and a pediatric nephrotic specialist, and Dr. Bellanti, an immunologist) and respondent's experts (Dr. Kaplan, a specialist in pediatric nephrology, and Dr. Levinson, an immunologist). As required by our case law, the special master gave particular weight to the testimony of J.M.'s treating physician, Dr. Quan. *See Capizzano v. Sec'y of Health & Human Servs.*, 440 F.3d 1317, 1326 (Fed. Cir. 2006). Nevertheless, the special master concluded that petitioner had not borne his burden of demonstrating by preponderant evidence that the

influenza vaccine caused a relapse of J.M.'s nephrotic syndrome.

First, the special master determined that minimal change nephrotic syndrome is not immune-mediated, i.e., it is not an inflammatory disease resulting from the dysregulation of the normal immune response. The special master relied on testimony from Dr. Kaplan, "a patriarch of pediatric nephrology," in support of her finding, which she credited over Dr. Bellanti's. J.A. 58. Both Dr. Kaplan and Dr. Levinson testified, and a separate academic article (Greenbaum) confirmed, that the medical community does not accept the view that minimal change nephrotic syndrome is immune-mediated. Accordingly, the special master determined that petitioner's causation theory lacked support as a general matter.

Second, the special master found J.M.'s theory of causation unlikely based on J.M.'s own medical history. J.M. experienced multiple events that would have impacted his immune system in the same or similar way as the October 2009 influenza vaccine (i.e., illnesses, infections, and vaccinations, including a November 2008 influenza vaccine). Yet none of these events precipitated either the initial onset of J.M.'s nephrotic syndrome or a relapse thereof. And none of the expert testimony nor the case studies cited by petitioner's experts supported as quick an onset of nephrotic syndrome symptoms following administration of a vaccine as that experienced by J.M.

The special master also concluded that the expert testimony presented by petitioner as to causation in J.M.'s case did not adequately support petitioner's theory. She found that, the case studies cited by petitioner's experts were all "speculating as to cause" and were, in any event, dissimilar from (and therefore not explanatory of) J.M.'s case. J.A. 61. For one, J.M.'s treating physician, Dr. Quan, admitted that "[t]here's no way to prove that the [October 2009] flu vaccine made anything worse." Transcript of

Hearing at 76, *Miles v. Sec'y of Health & Human Servs.* (Oct. 2017) (No. 1:12-vv-00254). Moreover, even petitioner's expert, Dr. Bellanti, testified only that an "innate immune injury," purportedly caused by the October 2009 influenza vaccine, "may be playing a role in the pathogenesis of [J.M.'s nephrotic syndrome]." *Id.* at 134. He admitted that he was relying, in part, on "magic and imagination" to divine such a connection, *id.* at 461–62, and conceded that the understanding of the "pathenogenesis or the pathological manifestation" of nephrotic syndrome continues to change "as we speak," *id.* at 142.

We find no error in the special master's determinations, and therefore *affirm*.

### AFFIRMED

COSTS

No costs.